**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

TOPAZ SMITH,                                                 :
                                                            :   Civil Case No.
                                        Plaintiff,           :
        v.                                                  :
                                                            :   **COMPLAINT**
WORLD ECONOMIC FORUM LLC, WORLD       :
ECONOMIC FORUM and KLAUS SCHWAB,      :
                                                            :   **Jury Trial Demanded**
                                        Defendants.          :
------------------------------------------------------------X

Plaintiff Topaz Smith ("Smith"), by and through counsel, Wigdor LLP, brings this

Complaint against World Economic Forum LLC and World Economic Forum (together, the

"Forum"), and Klaus Schwab ("Schwab") (collectively "Defendants"), and hereby alleges as

follows:

**PRELIMINARY STATEMENT**

1.      Defendant World Economic Forum is well-known for the Davos retreat ("Davos")

it has hosted in Davos, Switzerland since 1971.  Davos follows the technocratic-utopian vision of

its founder, Klaus Schwab, who believes that society will progress through greater cooperation

between businesses, and between businesses and government.  Davos aims to bring about that

vision by connecting business and governmental leaders at its conferences.  The Forum operates

a strategic consulting business with a similar goal and employs many subject-matter experts,

including Plaintiff Topaz Smith.  What started as a small nonprofit has become a $400 million

operation with about 1,000 employees in Geneva, New York and elsewhere.

2.      Speakers at Davos, and the Forum itself through its publications such as its well

respected Gender Gap Report, have repeatedly touted the importance of ending discrimination.

True to its technocratic character, these speakers and publications tend to critique discrimination

not by appealing to ethics but by appealing to pocketbooks.  For instance, Justin Trudeau's

lauded appearance at the 2018 Davos predicted that ending discrimination would "grow our economy, create jobs . . . [and] lead to innovation and change in the workplace."

3.      Sadly, the Forum fails to practice what it preaches.  Recent revelations, including from Forum insiders, show that the Forum has for years taken a scofflaw approach to antidiscrimination laws, permitting an atmosphere that is hostile to women and Black employees. It has also retaliated against employees who protest the discriminatory environment.

4.      As one report recently found, "[a]t least six female staffers were pushed out or otherwise saw their careers suffer when they were pregnant or returning from maternity leave. Another half dozen described sexual harassment they experienced at the hands of senior managers, some of whom remain at the Forum. Two said they were sexually harassed years ago by VIPs at Forum gatherings, including at Davos, where female staff were expected to be at the delegates' beck and call."  And, "[i]n two more recent incidents, employees registered internal complaints after white Forum managers used the N-word around Black employees. Black employees also raised formal complaints to Forum leaders about being passed over for promotions or left out of Davos."

5.      To make matters worse, the Forum promptly lashes out at anyone who protests the discriminatory environment.  For instance, Schwab fired the Forum's Human Resources ("HR") chief for refusing to lower the average age of the workforce by getting rid of a group of employees over 50 years old.  He also stripped a senior female executive of all responsibilities after she proposed remedying the discriminatory environment by strengthening the Forum's code of conduct and encouraging female employees to complain about harassment.

6.      Plaintiff Topaz Smith, a Black woman, was fired during her maternity leave. Told that her role had been "eliminated," the Forum brazenly filled her position with a non-

pregnant white woman and, true to the form of an organization that has never been held accountable for discrimination, announced the decision to everyone.

7.      Smith now files this complaint to force the Forum to reckon with its wide-ranging violations of law, including violations of 42 U.S.C. § 1981 ("Section 1981"); the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); 42 U.S.C. § 2000e *et seq*; the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331.

9.      The Court has supplemental jurisdiction over Smith's state and city law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this district because the events or omissions giving rise to the claims occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## ADMINISTRATIVE PREREQUISITES

11.     Smith will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and she will move for leave to file an Amended Complaint alleging violations of 42 U.S.C. § 2000e *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), following the EEOC's issuance of a Notice of Right to Sue.

12.     Pursuant to NYCHRL § 8-502, Smith will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

**PARTIES**

13.     Smith was an employee of both Defendant organizations.  She worked out of New York City.

14.     World Economic Forum is a nonprofit company headquartered in Switzerland.

15.     World Economic Forum LLC is a company located in New York City.  On information and belief, it is incorporated in the State of Delaware.

16.     The two entities, herein referred to as the Forum, were both Smith's employers at all relevant times.  Smith worked directly from offices owned and operated by World Economic Forum LLC and Smith's supervisors Andreas Hardeman, Francisco Betti and Margi Van Gogh all directed Smith's work on behalf of Defendant World Economic Forum from their offices in Switzerland.

17.     Schwab is the Forum's founder and, at all relevant times, controlled the Forum, including the New York City outpost.  He is, upon information and belief, domiciled in Switzerland.

**FACTS**

**I.     SMITH'S BACKGROUND**

18.     Topaz Smith is a consultant and international policy expert specializing in travel and tourism, international development and sustainability.  In 2014, she graduated from Pace University with a B.A. in Business Administration in Hospitality and Tourism Management.  After graduating, Smith worked for several years at a high-end hospitality organization based in Amalfi, Italy.

4

19.     In 2016, she graduated from the New School Milano School of Policy, Management and Environment with a Masters of Environmental Policy and Sustainability Management.

20.     By 2022, Smith had six years of experience consulting and working in international development, including three years as a Senior Consultant to development organization Labata Fantalle, and around one year as a Contracts Manager with the United Nations Sustainable Development Solutions Network.

21.     Between 2019 and 2021, Smith worked as Founder and CEO of EN-NOBLE, which worked with corporations in the hospitality space to promote travel and tourism to emerging regions.  Between 2021 and 2022, Smith founded and served as residency program manager of the start-up tech program of the Roux Institute at Northeastern University, which helped underrepresented managers and founders launch their high-growth business ideas.

22.     In 2022, Maine Governor Janet Mills appointed Smith to the Advisory Board of EPSCOR Funds for the State of Maine, which helps the State administer Science, Technology, Engineering and Mathematics ("STEM") funds from the U.S. Government.

23.     By 2022, Smith had a rare and valuable expertise in hospitality and tourism, especially as those business themes crossed with emerging and developing economies and issues of sustainability.  Smith was also fluent in conversing with C-suite executives, as her various roles had required her to help business leaders better understand her area of expertise.

## II.     DEFENDANTS HIRE SMITH

24.     In July of 2022, Smith joined the Forum as Community Lead, Aviation, Travel & Tourism.  In this role she would help the Forum fulfill its mission of connecting government and business leaders by developing content and co-creating projects for industry leaders and

organizing conferences and forums between business and governmental leaders, including subject-matter discussions for the Forum's famous Davos Conference.

25.     Though the industry has faced serious headwinds since COVID-19, precluding many leaders from spending money on the Forum's expensive consultancy services, Smith scored many successes during her tenure at the Forum.

26.     For instance, she successfully helped retain Axiom Space and Dallas-Fort Worth Airport as new clients.

27.     She also convinced CNN journalist Richard Quest to host a travel and tourism public session at Davos, something he had previously declined to do.

28.     The latter accomplishment aimed at turning around the Forum's flailing effort to engage travel and tourism business leaders, because, in recent years, the Forum has failed to deliver meaningful content to its travel and tourism CEOs, including at Davos.

29.     Quest is a sought-after voice in the field and was a major "get" for the Forum and Davos.

30.     Smith also helped build and maintain relationships with the European Travel Commission, the European Commission and the United Nations Tourism.

31.     During her time with the Forum, Smith's performance was stellar, and helped turn around a travel and tourism effort that was flagging when she joined.

## III.     SMITH'S EXPERIENCE OF DISCRIMINATION AT THE FORUM

32.     After a restructure in early 2023, Smith began reporting to Francisco Betti, Head of Global Industries Team, and Andreas Hardeman, Head of Aerospace, Aviation, Travel & Tourism.

33.     Hardeman and Margi Van Gogh, Cluster Head, Supply Chain and Manufacturing, both reported up to Betti, who in turn reported up to Jeremy Jurgens, Managing Director, Business Section.

34.     All of the foregoing would have had a say in any personnel decision involving Smith.

35.     Van Gogh was a known racist.

36.     Smith had met with Van Gogh during Smith's company onboarding in September of 2022, during which Van Gogh told Smith that she should consider her boss "her master."

37.     Previously, Van Gogh had told another Forum employee—an African, from Ghana—that a certain chocolate candy product in South Africa was nicknamed a "nigger ball."

38.     Van Gogh apparently thought this funny and either did not care or affirmatively enjoyed the pain such a slur would cause a Black colleague.

39.     It was widely known amongst employees that the Forum discriminated systematically against its Black employees.

40.     While the Forum generally paid for white employees to attend its famous Davos forum every year, it tended to find any excuse it could—including unconvincing and transparently false ones—to keep Black employees away from Davos.

41.     This was not because those employees were not needed at Davos.

42.     For instance, though the Forum would not pay for Smith's travel to Davos in early 2023, it had her participate *via* video in public sessions she had organized.

43.     This was an ineffective way for Smith to build relationships with government and business leaders, as the Forum would have understood.

44.     By contrast, the Forum was happy to pay for white employees who had organized Davos meetings or conferences, as Smith had, to travel to Davos.

45.     The Forum even paid for numerous unneeded employees to travel to Davos, including numerous white employees who were of a lower rank than Smith and were not actually needed to conduct forums or conferences.

46.     At one point, Smith asked why the Forum would not fly her to Davos.

47.     Her supervisor told her that the Forum could not afford for her to travel from New York City and that there was not a large enough "quota."

48.     Yet the Forum had no problem paying for numerous white employees to fly from New York City to Davos, including white employees who were not needed in person.

49.     The reason to exclude Black employees was not budgetary.  The Forum excluded Black employees from Davos because its vision of a technocratic utopia is white.

## IV.    SMITH ANNOUNCES HER MATERNITY LEAVE

50.     In early-mid 2023, Smith began a transition into a role as Partner Lead, Aviation, Travel and Tourism.

51.     This would have been a more client-facing role and would have called upon Smith to develop more new business (i.e. bring in new "partners," in the Forum's terminology), where her Community Lead position focused more on servicing pre-existing partners.

52.     Nonetheless, Smith had already been developing new business and was poised to perform well in the Partner Lead role.

53.     In mid-2023, Jurgens, who was Smith's third-tier supervisor, sent Smith an email about transitioning to the Partner Lead role.

8

54.     One important aspect of the transition would have been to introduce Smith as the Partner Lead to some of the leaders of the Forum's client companies.

55.     Leaders at American Express, Swiss Airlines and Trip.com were all on the agenda.

56.     One aspect of this transition was already effectively completed by 2023.  Smith had already met, and already had a good business relationship with, Trip.com CEO Jane Sun.

57.     In 2023, the Forum planned on hiring a Fellow from the leading consultancy firm Kearney.  Smith was also slated to work closely with this Fellow.

58.     Early in 2023, Smith became pregnant.  She announced her pregnancy to the Forum in or around March of 2023, telling her supervisors Hardeman and Betti that she would take a maternity leave beginning in September.

59.     After March, Smith's supervisors began a hostile response to the announcement, and Smith's position at the Forum began deteriorating.

60.     First, Smith heard nothing further (apart from the automatic notice discussed immediately below) from her supervisors about the Partner Lead position, and all progress towards transitioning her to that role ceased.

61.     As late as August 17, 2023, Smith received an automatically generated notice from the Forum's internal system documenting the change in position, demonstrating that the change had been formalized previously.

62.     Nonetheless, when she asked her supervisors in summer of 2023 when the Forum would begin introducing her to its partners, Van Gogh, Hardeman and Betti told her that it would be too disruptive to introduce her to important partners before she took maternity leave, but the transition would begin as soon as she returned.

63.     Van Gogh, Hardeman and Betti reassured her that another consultant, Abishek Gupta, would "hold on" to the Partners while she was on leave, but that she would still be starting as Partner Lead as soon as she returned from her maternity leave.

64.     These were not only lies, as Smith would later learn, they were also open admissions of pregnancy and leave-based discrimination.

65.     Nor did Smith hear anything further about the Kearney Fellow.

66.     Because the Kearney Fellow was slated to work closely with her, Smith should have been closely involved with Hardeman in putting out the Request for Proposal ("RFP") that would describe the role.

67.     Shortly before her maternity leave, she learned the RFP had been completed without any input from her, establishing that Smith's supervisors already knew Smith would lose her role.

## V.     THE FORUM TERMINATES SMITH'S EMPLOYMENT

68.     In September of 2023, Smith went on FMLA protected maternity leave.

69.     The leave was originally scheduled to end early in the new year.

70.     Because of complications requiring an emergency surgery, Smith was incapacitated and unable to work for an additional two months after the end of 2023.

71.     She requested, and the Forum granted her, an additional two months of protected leave, and she returned to work in February of 2024.

72.     She requested the leave both under the FMLA and as an accommodation for disability.

73.     As soon as Smith returned, her supervisor Hardeman informed her in a Zoom call that the Partner Lead position that she was slated to begin had been eliminated.

74.     This was absurd on its face.  Nothing had changed in the organization from the time the Forum had originally planned for her to take the Partner Lead position.

75.     Nor had any broader restructuring occurred.

76.     Hardeman began a cold follow up email with "Welcome back to the office! It was good to reconnect last Thursday and to hear that you, your kids and family are all doing well. I want to formalize our conversation [about Smith's termination] for clarity as well as keep the dialogue open for any questions."

77.     If the email was cold in tone it was telling in its contents, making explicit the link between Smith's return from maternity leave and the purported elimination of her position.

78.     Hardeman went on to explain that the Forum had "created a 6-month temporary role for [Smith] as Project Lead, Travel and Tourism."

79.     The position was no more than a sop to try to convince Smith to move on without holding the Forum accountable for its obvious discrimination.

80.     The Forum also offered a nominal severance package.

81.     The Forum maintained total opacity around its decision.

82.     Smith met several times with Hardeman and an HR employee to learn from them why she had lost the role.

83.     During two unedifying conversations, they refused to disclose anything of substance and simply repeated that the position had been eliminated.

84.     The Forum shamelessly went on to fill the role it claimed it had eliminated.

85.     It filled the role with a white woman who was not pregnant, Laragh Marchand.

86.     Its announcement of Marchand's hiring was truly brazen—the hypocritical statement of an organization that feels itself completely impervious to accountability.

87.    In an email on May 20, 2024, the Forum announced that Marchand would take the role of "Partner Lead, Advanced Manufacturing, Aerospace, Aviation, Travel and Tourism."

88.    The title apparently gave to Marchand Smith's exact portfolio of responsibility in Aviation, Travel and Tourism.

89.    While Marchand's title added the word Aerospace, it is not clear what this would mean.

90.    Smith had always covered Aerospace companies as part of her "Aviation" duties.

91.    For instance, Axiom Space, a client brought in by Smith, was an "aerospace" company.

92.    Why these responsibilities were combined with the "Advanced Manufacturing" theme is unclear and appears to make little business sense, as companies in the Advanced Manufacturing sector would have totally different needs than companies in the other four sectors.

93.    Moreover, Marchand does not in fact have any experience in Travel and Tourism—her expertise is in Advanced Manufacturing.

94.    Smith had been told upon hiring that Travel and Tourism experience was vital to the role.  That was not apparently true, however, for her replacement.

95.    The priority, it appears, was to give Smith's role to someone deemed a better fit for the Forum's demographic preferences, regardless of whether the reassignment made any business sense.

96.    After a meeting with her replacement, Smith learned that the Forum would, true to its discriminatory pattern in the past, pay for Marchand to attend Davos.

## VI.    THE FORUM'S DISCRIMINATORY ENVIRONMENT

97.    Smith's experience at the Forum was not unique.  Remarkably, she is one of at least half-a-dozen women whose careers have suffered because of the Forum's discriminatory practices.[1]

98.    In 2017, Schwab tapped a young woman to lead a startup initiative.  The woman revealed to Schwab that she had become pregnant only a few days into her job.  Schwab promptly told her that she was not suited for the job and pushed her out.  Apparently, Schwab believed that because the woman became pregnant, she would no longer be able to work at the same pace.

99.    Jurgens, one of Schwab's lieutenants, demeaned a woman who had just returned from maternity leave.  HR directed her to a therapist but did nothing to discipline Jurgens.  Ultimately, she opined that the Forum is "not the kind of place that you can confidentially declare [you're] pregnant to your manager and expect that the workload might be eased whilst trying to juggle first trimester exhaustion."

100.    The Forum's discriminatory treatment of pregnant women is unsurprising given senior executives set a tone that routinely sexualized and objectified women.  For instance,

- women were warned about being alone with Schwab, who made uncomfortable comments about their appearance, such as telling one woman that she needed to lose weight.

- Schwab's personal assistant described that Schwab made her feel uncomfortable by complimenting her clothes, hair and body.

- Schwab made suggestive comments to other women, such as asking them to private dinners and excursions, and telling another that he wanted to see her in a

---

[1]    The Forum does not deny that these pregnant women were removed.  Rather, it has taken the incredible, and rather convenient, position that all of them were poor performers or let go as part of restructurings.

Hawaiian costume while propping his leg on a desk and placing his crotch in front of her face.  Indeed, Schwab used the crotch pose in front of other women.

- Schwab told another woman, "I need to find you a man, and if I were not married, I would put myself on the top of that list."

- Women were under "a lot of pressure to be good-looking and wear tight dresses," as one female staffer described.

- Young female staffers were often propositioned by Forum partners and attendees, including one woman who was asked by a CEO to come back to his room for whiskey.  Another received a text stating, "You look pretty today" and asking to get a drink.  She also described having to fend off a government minister who asked her to his hotel room to deal with a "supposed problem."

- Another female staffer was forcibly kissed and touched without her consent by a male manager.

- In 2010, a male employee pretended to be a medical doctor during a flu vaccination drive and tried to get a female staff member to take off her shirt and move her body in different positions.  Upon learning of the incident, Jurgens laughed.  The male employee is now the Forum's head of technology and digital services.

- Male Forum employees were often asked by constituents to identify "girls to go out with this evening."

- Sex between Forum staffers and VIPs was described as "white on blue action," a reference to the color of the badges worn by the two groups.

101.  Black employees were also the target of discrimination:

- Jean-Loup Denereaz, Schwab's long-time operations chief, remarked, "What can you expect from a N-," after learning that a Black woman complained about his discriminatory conduct.

- In September of 2022, while at a team lunch, Van Gogh, a South African manager and another white employee, described chocolate-covered marshmallows as "N-balls."

- A Forum manager questioned a Black female employee about her wig and, while brandishing matches, asked if he could set it on fire.

14

- A least half-a-dozen Black employees, including Smith, were blocked from advancing their careers at the Forum by either being passed over for promotions or having opportunities suddenly denied to them.

- In some instances, the Black employees were told that they needed to "smile" more or were criticized for not being "visible" enough.

- One Black employee complained that "all the staff members" the Forum sent to Davos as part of its Diversity, Equity and Inclusion ("DEI") team "are white and from Europe."

102.    Unfortunately, there was no avenue for these employees to raise complaints.

103.    Schwab effectively runs the Forum.  His two children hold senior roles.  His wife is the co-chair of a sister organization.  And the Forum's bylaws require that Schwab or one of his immediate family members serve on the Board of Trustees.

104.    As  Schwab's personal assistant described, "You cannot go and complain, it was impossible."

105.    As a result, discrimination complaints are often buried and those who protest are punished.  For instance,

- A senior female executive tried to change the discriminatory culture by proposing internal changes, such as improving the Forum's code of conduct and encouraging employees to report harassment.  Schwab promptly stripped her of responsibilities, forcing her to resign.

- The manager who forcibly kissed and touched a female staffer had multiple complaints against him.  The Forum knew about his "predatory" behavior "but it did nothing for almost 3 years to stop the harassment and take care of victims." The manager ultimately found a job at one of the Forum's partners.

- The woman who complained that she was almost tricked into taking off her shirt became the target of performance criticism and, within months, was dismissed purportedly for poor job performance.

- The Forum's HR department responded to a complaint that Roberto Bocca, a senior executive, disparaged a female employee as a "bitch" by explaining that he was merely "Italian and very passionate."

- Only a few years ago, Schwab decided that he wanted to lower the average age of the Forum's workforce. He singled out a group of employees over 50 and instructed his HR chief to fire them. The HR chief refused. Schwab responded by firing the HR chief.

## FIRST CAUSE OF ACTION
### (Race Discrimination in Violation of 42 USC Section 1981)

106.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

107.   Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981.

108.   As a direct and proximate result of Defendants' unlawful conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

109.   As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages and other relief. Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Violation of the Family and Medical Leave Act)

110.   Plaintiff repeats and realleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

111.   By the acts and practices described above, Defendants violated Plaintiff's FMLA rights.

16

112.    As a direct and proximate result of this unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary harm for which she is entitled to an award of damages.

113.    Defendants' unlawful actions were willful, entitling Plaintiff to an award of liquidated damages.

## THIRD CAUSE OF ACTION
### (Race, Gender, Pregnancy, Familial Status and Disability Discrimination in Violation of the NYSHRL)

114.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs, as if set forth fully herein.

115.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, gender, pregnancy, familial status and disability in violation of the NYSHRL.

116.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

117.    Defendants' unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation Under the NYSHRL)

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

119.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYSHRL because she requested an accommodation for disability

120.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

121.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

122.    Defendants' retaliatory actions were willfully negligent, reckless and/or committed with a conscious or reckless disregard of Plaintiff's rights under the NYSHRL.

### FIFTH CAUSE OF ACTION
**(Race, Gender, Pregnancy, Caregiver Status and Disability and Discrimination in Violation of the NYCHRL)**

123.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs, as if set forth fully herein.

124.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, gender, pregnancy, caregiver status and disability in violation of the NYCHRL and/or subjected her to a hostile work environment.

125.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

126.    Defendant's unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation Under the NYCHRL)

127.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

128.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYCHRL because she requested an accommodation for disability.

129.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

130.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

131.    Defendants' retaliatory actions were willfully negligent, reckless and/or committed with a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

## PRAYER FOR RELIEF

**WHEREFORE**, Smith prays that the Court enters judgment in her favor and against World Economic for the following relief:

A.      A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States, the State of New York and City of New York;

B.      An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of liquidated damages;

H.      Prejudgment interest on all amounts due;

I.      Reinstatement;

J.      Front pay;

K.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

L.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 8, 2024
     New York, New York            Respectfully submitted,

                                            **WIGDOR LLP**

                                            By: _____
                                                     Valdi Licul
                                                     John S. Crain

                                            85 Fifth Avenue
                                            New York, NY 10003
                                            Telephone: (212) 257-6800
                                            Facsimile: (212) 257-6845
                                            vlicul@wigdorlaw.com
                                            jcrain@wigdorlaw.com

                                            *Counsel for Plaintiff*